JEREMIAH J. MURPHY *vs.* DAVID L. WEBSTER & others.

Suffolk.   January 7, 8, 1890. — February 26, 1890.

Present: DEVENS, W. ALLEN, C. ALLEN, HOLMES, & KNOWLTON, JJ.

*Personal Injuries — Master and Servant — Due Care.*

At the trial of an action to recover for personal injuries occasioned to the plaintiff
while in the defendant's employ, by being struck by an elevator car in the de-
fendants' factory, there was evidence that the plaintiff had for two months used
the elevator in the course of his employment; that the shipping rod, by which
the elevator was operated, although within the well, was not in the line of pas-
sage of the car, and it was unnecessary for him to expose any part of his per-
son in handling it; that being on the first floor, and having occasion to use the
elevator, which was at the second floor, he pushed up the shipping rod and the
car did not come down; that he pushed it up again, and the car still did not
come down; that, instead of going up stairs near by to the second floor, where
all the machinery would have been open to his view, he then put his head into
the well to see if there was any slack of the elevator rope, and then pushed up
the shipping rod the third time; and that the car then came down and struck
him, causing the injuries. *Held*, that there was no evidence of due care on the
part of the plaintiff, and that he could not maintain the action.

TORT for personal injuries occasioned to the plaintiff while in
the defendant's employ by being struck by an elevator car.   At
the trial in the Superior Court, before *Hammond*, J., there was
evidence tending to prove the following facts.

The defendants were tanners, and used in their business a
building two stories high, in which there was a freight elevator
running from the first to the second floor, a distance of about
eleven or eleven and a half feet.   The elevator was put in at
the erection of the building, in 1877, and was constructed and
used to carry leather to and from the second story of the build-
ing.   The elevator car weighed from five hundred and fifty to
six hundred pounds, and ran between two posts, to which were
attached wooden slides fitting into wooden grooves in the op-
posite sides of the car.   This elevator well was situated at the
end of the building, and on the first floor was between two
rooms, called respectively the pressroom and the tanyard-room,
and opened into each by means of double doors.   These rooms
were connected by a door outside of the elevator well, by means
of which a person could go from one room to the other without

going under the elevator car through the elevator well.   There was also a door opening from each of these rooms near the elevator into the yard outside of the building, forming an outside means of communication from one to the other.   On each side of the elevator well in both the pressroom and the tanyard-room, the defendants had caused to be put up, about six feet from the floor, a sign consisting of large black letters, and reading, " No passing through the elevator well."   On each side of the cross head of the elevator car was placed a sign reading, " Riding on the elevator strictly forbidden."   There were several such signs on the elevator well in the second story, where there were automatic guards to prevent persons from walking into the well when the doors were open.   The elevator was provided upon both stories with double doors, which when shut completely closed in the elevator well.   There was no safety apparatus on the elevator car, or any other safety apparatus whereby the car would be securely held in the event of accident to the shipping rod or hoisting machinery.

The elevator was of the kind known as the worm or worm-gear elevator, in common and general use, and was sufficient in its plan and construction.   The machinery which operated it was set in motion by means of a shipping rod, which was situated inside the well and was reached by the person handling it from the pressroom near the door opening therefrom into the well. There was, as shown by a model used in evidence at the trial, a space of several inches between the opposite sides of the elevator well and the corresponding sides of the car as it hung in the well or passed up and down between the floors of the building. The shipping rod was hung in this space, about an inch from one side wall of the well and several inches from the line of passage of the car, and about five inches from the double doors, opening into the well from the pressroom.   To bring the elevator car down it was necessary to push the shipping rod up, and this would cause the drum on which was coiled the rope attached to the car to unwind the rope and lower the car.   The operation of the elevator was such that the car in descending would, about a foot from the bottom of the well, strike a dog on the shipping rod, which would throw off the belt causing the car to be lowered, and the car would then stop ; and there was a similar

dog at the second floor to stop the car in ascending. If the elevator were prevented from reaching the dog at the bottom, the rope on the drum would completely unwind, and would then wind up backwards and pull the car back again to the top of the well. The speed of the elevator, in its usual and ordinary motion, was about fifty feet a minute. The model also showed that the machinery of the elevator was all in plain sight from the second floor of the defendants' building. If the elevator car should fall from the second story, it would strike an object four feet from the ground with a force of about eight thousand to nine thousand pounds, after allowing for all possible friction.

About three weeks before the accident, a steam-pipe used for heating the building burst at a point near the elevator, and the steam, escaping into the well, caused the slides on the posts and the grooves on the car to swell, and the car to stick. One Harmon, a carpenter and millwright, intrusted by the defendants with the duty of keeping the machinery in the building in repair, at once attended to the necessary repairs. The grooves on the car were planed out, and two blocks, each about one foot long, in which were grooves, substituted therefor. The elevator was then tried, and found to run perfectly, there being a play of one eighth to one quarter of an inch between the slides and grooves to lessen the possible friction. There was no evidence that the elevator ever stuck again. The accident to the plaintiff occurred about a quarter before twelve o'clock, noon, immediately after which he was found under the car, which was then about four feet from the ground going up. During the morning the elevator had been in constant use, and had run perfectly, and immediately after the accident it was examined and operated, and found to work perfectly and without sticking. The plaintiff, when going through the elevator well under the car, had been warned orally not to go there again, and had been cautioned the morning of the accident not to put his head in the elevator well.

The plaintiff testified that at the time of the accident he was about twenty-five years of age; that he had been in the employ of the defendants from May 23, 1884; that he had used the elevator in question off and on for about two months before the accident; that a part of his duty was to take and collect leather

from various places, put it on a truck provided for the purpose, which ran on a track through the tanyard-room near the elevator, run the truck on the elevator car, send the elevator up, ascend himself by means of stairs close at hand, pull the truck off the car and distribute the leather in the drying-room; that he had used the elevator several times that morning; that he did not observe anything the matter with it; that he had just taken down an empty truck and had loaded it up again and brought it into the tanyard-room near the elevator; that he had then gone to another building across the yard to get a drink of water, (which building was about ninety feet away,) had then come back to the elevator at the pressroom side to the place where the shipping rod was, had stood " right on the side of the edge of the elevator well," taken hold of the shipping rod, and shoved it up; that it did not come, and he shoved it up again; that it did not then come; that he then put his head into the well to see if there was any slack of the elevator rope; that he then shoved the shipping rod up a third time, and then the elevator came down and struck him about the knee, across the thigh, and on the instep, and also struck his upper arms on the muscles and bruised them, and that he then became unconscious; that when he became conscious he was in the tanyard-room near the elevator, and that he did not know whether anything was the matter with the elevator or not.

The plaintiff contended that the jury would be warranted in finding, from the nature of the accident, that it would not have occurred if a safety appliance, as required by statute, had been attached to the elevator.    There was no further evidence tending to show the cause of the accident, or that the plaintiff was in the exercise of due care.    The defendants requested the judge to rule that the plaintiff was not entitled to recover; but the judge refused so to rule, and submitted the case to the jury, upon instructions which permitted them to find that the plaintiff was in the exercise of due care, and could recover for his injuries.

The jury returned a verdict for the plaintiff; and the defendants alleged exceptions.

*B. F. Butler & J. C. M. Bayley,* for the plaintiff.

*W. Gaston & C. E. Beale,* (*W. A. Gaston* with them,) for the defendants.

KNOWLTON, J.  The evidence in this case fails to furnish satisfactory grounds for an inference, or for anything better than mere conjecture, as to the cause of the accident.  The building was only two stories high, and the elevator ran from the lower to the upper floor, a distance of about eleven or eleven and one half feet.  The plaintiff was injured by the descent of the car upon him in the elevator well on the lower floor.  In the ordinary operation of the elevator, when the car descended, it struck a dog about a foot above the floor, which threw off the belt and stopped it ; but if anything prevented it from striking the dog, the rope on the drum would completely unwind, and would wind up backwards and draw up the car again.  There was uncontradicted evidence that almost immediately after the accident the plaintiff was seen under the elevator car, and that the car was then about four feet from the floor, going up.  The accident happened at about a quarter before twelve o'clock, and it appeared that the elevator had been in constant use that morning, and that the plaintiff was using it just before the accident, and that it had run perfectly.  It continued to run perfectly after the accident, and no repairs were made upon it subsequently.  The plaintiff testified that he did not know whether anything was the matter with it or not.  The bursting of a steam-pipe near it, about three weeks before, had caused it to stick, but it was immediately repaired by planing out the grooves on the car and substituting blocks in which were grooves, and it was then tried and found to work perfectly, and there was no evidence that it ever afterwards stuck.  It was shown that, " if the elevator car should fall from the second story, it would strike an object four feet from the ground with a force of about eight thousand to nine thousand pounds, after allowing for all possible friction."

There is much in the case to indicate that the elevator did not fall, and that the plaintiff was injured by negligently being caught under the car in the elevator well when the car was descending in the usual way.  But if we assume that the jury might have found that the elevator fell, and that the failure of the defendants to provide a mechanical device to hold the car, as required by the St. of 1882, c. 208, was one of the causes of the

accident, and that the plaintiff is not shown to have had such a knowledge and appreciation of the risk from such failure as to preclude him from recovering, or if we assume that the jury might have found from the circumstances that there was some other defect in the elevator which might have been remedied by the exercise of due care on the part of the defendants, and that the defendants had so far intrusted to Harmon the performance of their duty of supervision of the elevator, and of repairs which might properly be made by servants, as to make them liable for his negligence, we come to the question whether the plaintiff has shown that he was reasonably careful.

The defendants had taken great precautions to prevent persons from passing into the elevator well. In both stories the elevator was provided with double doors, which, when shut, completely closed in the elevator well. In the second story there were automatic guards to prevent persons from walking into the well when the doors were open. On each side of the cross-head of the elevator car were painted the words, " Riding on the elevator strictly forbidden." In conspicuous positions on the side of the elevator well on the first floor were two signs, reading, " No passing through the elevator well." The elevator was at the extreme northerly end of the building between two rooms. Just at the elevator there was a door in the partition between the rooms through which one could pass from one side to the other of the elevator well. From each room there was a door into the yard, very near the elevator, furnishing a convenient passageway there from one side to the other. There were also stairs near by leading from the first to the second story.

It is undisputed that the plaintiff was partly or wholly in the elevator well when he was injured. He testified that he was struck on his upper arms, across the thigh, about the knee, and on the instep. It is clear that he could not properly have been in the elevator well in the performance of his duties. He had worked for the defendants eight months, and had used the elevator about two months before the accident. The shipping rod which worked the machinery was not in the line of passage of the elevator car within the elevator well, and the plaintiff had no occasion to expose any part of his person in raising or lowering the car. Upon the plaintiff's evidence, which presents the

view of the case most favorable to him, he had pushed up the shipping rod, by which the car was lowered, and the car did not come down; he pushed it up again, and the car did not then come; he then put his head into the well to see if there was any slack of the elevator rope, and then pushed up the shipping rod the third time, and the elevator car came down and struck him.

According to his account, he had twice adjusted the machinery in the proper way to bring the car down. He must have known that something was wrong in the working of the elevator. It appears by the model and the testimony, that he had only to go up the stairs to the second story to have all the machinery open to his view. The ordinary speed of the elevator was about fifty feet per minute. The floor of the car before it began to descend was less than six feet above his head. He had pushed up the shipping rod to connect the belt which should bring down the car, and, when it did not start at once, he voluntarily placed himself under it to see what was the matter. These facts furnish no evidence that he was in the exercise of due care. On the contrary, they show that, knowingly, and without excuse, he put himself in a place of great danger, in a way which the general judgment of common men would at once condemn as careless. *Taylor* v. *Carew Manuf. Co.* 140 Mass. 150, and 143 Mass. 470.                    *Exceptions sustained.*